On Application for Rehearing

THOMAS, Judge.
The opinion of this court released on November 2, 2007, is withdrawn, and the following is substituted therefor.
This is a boundary-line dispute between coterminous landowners. In June 2005, Edwin Taylor filed a complaint alleging that, for more than 20 years, the boundary *505 line between his property and the property owned by Debbie Jacks and Perry Jacks had been marked by a fence; that he and the Jackses’ predecessors in title had agreed that the fence was the boundary line but that a dispute had recently arisen between the parties as to the location of the boundary line; and that the Jackses had trespassed upon his property and had begun erecting another fence. Taylor sought a judicial determination of the boundary line and a temporary restraining order (“TRO”) to prevent the Jackses from trespassing on or otherwise interfering with his property.
The Jackses answered, denying that the parties or their predecessors in title had ever acknowledged a fence as the boundary line between their properties and alleging that the boundary line was the section line between Section 4 in Township 21 and Section 33 in Township 22. The Jackses also alleged that Taylor had faded to name an indispensable party, namely Bobbie Smitherman Adams, who, they said, also shared a boundary with Taylor along the section line.
Taylor amended his complaint to name Adams as an additional defendant. Following a bench trial, the trial court entered a judgment finding that “the boundary line between [Taylor’s] property and [the Jackses’ and Adams’s] property is the old lane fence, described by [the Jackses and Adams] and their witnesses as the inside fence, apparently still remaining this day.” The Jackses and Adams appealed to the Alabama Supreme Court, which transferred the appeal to this court pursuant to § 12-2-7(6), Ala. Code 1975.

Factual Background

In 1957, Taylor purchased property described as “[t]he south half of the south half of the southwest quarter, Section 33, Township 22, Range 15, containing 40 acres, more or less.” Taylor’s property is bordered on the south by property owned by the Jackses and Adams. The northern boundaries of both the Jackses’ property and Adams’s property are described by reference to the section line dividing Section 4 and Section 33.
The Jackses’ May 21, 1999, deed describes their property as:
“A parcel of land containing 6.30 acres, more or less, being more particularly described as follows: Begin at the NE comer of Section llh Township 21 North, Range 15 East, Chilton County, Alabama and run thence W along the N line of Section J and a fence line a distance of ⅛,013 5.5 feet to the point of beginning of the parcel herein described; from the point of beginning thus established [1] continue Westerly along a fence line a distance of 411 feet; from said point run thence S a distance of 640 feet to a point; from said point run thence E a distance of 411 feet, more or less, to a point; from said point run thence N 640 feet to the point of beginning. Also an easement for right of way for ingress and egress and installation of necessary utilities, said easement being described *506 as follows: A strip of land of uniform width and 15 feet wide along either side of the following described line, said line being the centerline of said easement: “Begin at the NE corner of Section 4, Township 21 North, Range 15 East, and run thence W a distance of 4,013.5 feet to a point; from said point continue W a distance of 411 feet, more or less, to a point; from said point run thence S 1280 feet to a point on the N margin of a dirt road; from said point run thence E along the N margin of said dirt road a distance of 15 feet to the point of beginning of the centerline of said easement; from said point run thence N a distance of 640 feet, more or less, to the S line of that parcel above described, said easement being 30 feet wide and 15 feet on either side of the aforesaid described property and connecting the 6.3 acre parcel above described with the N margin of the County dirt road, i.e., County Road 488.”
An Adams deed dated July 11, 1975, describes the northern boundary of one parcel of her property as “along the North line of Section 4, a distance of 194 feet ... [s]aid lot or parcel of land lying and being in the Northwest Fourth, Section 4, Township 21, Range 15, Chilton County, Alabama, and containing two-thirds of an acre.” An Adams deed dated July 22, 1975, describes another parcel of her property as “[a] lot or parcel of land lying and being situated in the NW 1/4 of the NW 1/4, Section 4, Township 21 North, Range 15 East, Chilton County, Alabama, containing 13 acres, more or less,” with the northern boundary being described as follows:
“From the Northeast corner of the NW 1/4 of the NW 1/4, of Section 4, Township 21 North, Range 15 East, run West on and along the North boundary line of said Quarter-Quarter 411 feet to a point, which said point is the point of beginning of the property herein described. From said point as the point of beginning, continue to run West on and along the North boundary of said Quarter-Quarter 897.5 feet to a point on the East right of way line of a paved county road
[[Image here]]
Adams’s July 22, 1975, deed includes the following additional provision, not found in any of the other deeds at issue in this case.
“It is understood and agreed by the parties hereto that the fences presently located on the North and East line of the property described herein are not property lines but are fences mutually agreed on as pasture lines only.”
Taylor testified that when he acquired his property in 1957, there was a fence along the southern edge of the property. He stated that, in the 50 years that he had owned the property, he had repaired or rebuilt the fence several times but he had never changed the location of the fence. Throughout the record, the parties referred to that fence as “the inside fence.”
Taylor acknowledged that at some time in the past there had existed another fence, which the Jackses and Adams and their witnesses referred to “the outside fence,” running parallel to and just north of the inside fence. The evidence was undisputed that, although the outside fence no longer existed at the time of trial on May 22, 2006, remnants of the outside fence remained, specifically fence wiring that was embedded in a large red oak tree on the northeast corner of the Jackses’ property. All the parties agreed that the area between the inside fence and the outside fence had been used by Taylor and by the Maddoxes — the Jackses’ and Adams’s predecessors in title — as a “cattle lane,” a way to move cattle between the pastures on various parcels owned by Taylor and by the Maddoxes. In addition, *507 Taylor testified that he had used the area to grow crops, including peaches, watermelon, and wheat, and hay for his cattle. Taylor identified the inside or southernmost fence as the boundary between his property and the property of the Jackses and Adams. He acknowledged that his property was in Section 83 and that he did not own any property in Section 4.
Taylor testified that in May or June 2005 he saw a man working on what he considered to be his side of the fence. Taylor identified Darryl Bice, the son of Debbie Jacks and the great-nephew of Bobbie Adams, as the man he had seen on his property. Bice informed Taylor that he had purchased a parcel of property from Adams, that he had had the property surveyed, and that he was staking out the property for a fence. When Bice began building the fence, Taylor filed the present lawsuit.
Neil Taylor, Edwin Taylor’s 55-year-old son, testified that the inside fence had marked the boundary between his father’s property and the property to the south for as long as he could remember. He said that in May or June 2005 he found a steel stake that had been driven into the ground on his father’s side of the property and asked Bice about it. Bice stated that the surveyor he had hired had placed the stake in the ground.
Debbie Jacks identified the deed to her property; she stated that she had received the property in 1999 from her brother, who had received the property from their father, Billy Maddox. Jacks, who was 50 years old at the time of trial, testified that she had grown up on the property, which had been in her family since 1918. She said that the fence lines on the property— both of the existing inside fence and of the formerly existing outside fence — “were not the land line.” She testified, “My grandfather on down has always told us that the fence lines — and I believe we have it on one of the deeds — -that the fence line is not the land line.” She described a large red oak tree that, she said, marked the section corner. Jacks stated that she had never been aware that Taylor was claiming that he owned the property up to the inside fence until her son, Darryl Bice, had begun to erect a fence after having commissioned a survey. She said that, while her son was putting up the fence, Taylor pushed his truck against the fence and asked her son what he was doing. Jacks replied, “We had [the property] surveyed and we [are] putting up a fence ... six inches this side of what [the surveyor] said was the line.” Taylor responded by pointing to the inside fence and stating that there “was already a fence up and it was the one over there.” Jacks replied that the inside fence “was not the land line.” According to Jacks, Taylor said that “it didn’t matter; that fence was standing.” Jacks testified that on three, occasions between 1995 and 1997 Taylor or someone acting on his behalf and at his direction had cut trees in the disputed area. She said that on each occasion a member of her family had instructed Taylor to stop the cutting and that Taylor had complied with those instructions.
Debbie Jacks’s aunt, 72-year-old Bobbie Adams, identified her deeds and stated that she had lived on the property described therein since 1934. Adams corroborated Jacks’s testimony concerning the cutting of timber. She testified that sometime in the mid-1990s she saw three men cutting timber on the northwest corner of her property, in what she called “the cow lane.” She asked the men who had given them the authority to cut the trees, and when they replied that they were working at Taylor’s direction, Adams responded, “[W]ell, I’m asking you to stop because this is not Mr. Taylor’s land. This is my land. You can go tell Mr. Taylor [that] if *508 he wants to come talk to me I will be at the house.” Adams said that Taylor never came to speak to her. She explained that her father and Taylor’s father had had an agreement that Taylor could “use the cow lane,” but, she said, the cow lane was “not [Taylor’s] to keep.”
Billy Maddox, Debbie Jacks’s father and Adams’s twin brother, testified that he, his father, and his son had been previous owners of the property that the Jackses owned at the time of trial. Maddox said that, approximately two weeks before his father died, his father had reminded him that “the inside fence was not the line, that the outside [fence] was the line.” Maddox said that he had seen the outside fence in existence before his father died but that, after his father died, the outside fence was taken down and the inside fence was repaired. Maddox stated that, although he had not seen anyone dismantling the outside fence, he had an idea who had done it. Maddox testified that he thought the new fence built by Darryl Bice stood on the boundary line. Carolyn Maddox, the wife of Billy Maddox, testified that the outside fence, which had stood until the mid-1980s, had represented the correct boundary line.
Darryl Bice testified that he was 31 years old and had lived on his mother’s property all of his life. He stated that he had purchased a portion of his great-aunt Bobbie’s acreage and that he was planning to place a mobile home on the property. To that end, he said, he had commissioned a survey and had begun building a fence “roughly six inches to a foot off the survey line.” Bice said that the survey line came out “three feet to the inside of the red oak tree” on his mother’s property. In addition, he said, “the U[nited] S[tates] Geological] S[urvey] section forty corner and section marker ... is tied dead into [his] fence.”
The surveyor was not called to testify, and the survey was neither offered nor admitted in evidence. No maps, plats, or other documents purporting to show the location on the ground of the line dividing Section 33 from Section 4 were offered or admitted in evidence.
Like his mother and his great-aunt, Bice also testified that Taylor had cut trees on his family’s property. He testified that on one occasion in early 1997 he had come home from college at his grandfather’s request and had stopped Taylor from cutting wood. When Bice was asked, on direct examination, whether Taylor had “made any allegation at that time that he owned that land and could do what he wanted to do with it,” he answered, “No ... he did not protest it.”

Standard of Review

Our standard of review in a boundary-line case is extremely deferential. In Bearden v. Ellison, 560 So.2d 1042 (Ala.1990), our supreme court stated:
“Where a trial court hears ore tenus testimony, as in this case, its findings based upon that testimony are presumed correct, and its judgment based on those findings will be reversed only if, after a consideration of all the evidence and after making all inferences that can logically be drawn from the evidence, the judgment is found to be plainly and palpably erroneous. The trial court’s judgment will be affirmed if there is credible evidence to support the judgment. Furthermore, where the trial court does not make specific findings of fact concerning an issue, this Court will assume that the trial court made those findings necessary to support its judgment unless such findings would be clearly erroneous.”
560 So.2d at 1043-44 (citations omitted).

Discussion

Generally, “[i]n a boundary dispute, the coterminous landowners may alter the *509 boundary line between their tracts of land by agreement plus possession for ten years, or by adverse possession for ten years.” Kerlin v. Tensaw Land & Timber Co., 390 So.2d 616, 618 (Ala.1980). See generally 1 Jesse P. Evans III, Alabama Property Rights and Remedies § 12.4[a] and [b] (3d ed.2004).

Alteration of the Boundary Line by Adverse Possession

Taylor neither alleged nor proved that he owned the disputed area by adverse possession.
“The law concerning adverse possession by a conterminous landowner is well settled:
“ ‘[I]n Alabama there are basically two types of adverse possession; statutory adverse possession, and adverse possession by prescription. Both require the common elements of actual, exclusive, open, notorious, and hostile possession under a claim of right, but the statutory version, which requires possession for only ten years rather than the twenty years required by the prescription version, also requires that the possessor hold under color of title, have paid taxes on the property for ten years, or have derived his title by descent or devise. Code 1975, § 6-5-200. Downey v. North Alabama Mineral Development Co., 420 So.2d 68 (Ala.1982). However, in cases like the present one, where adverse possession is claimed by a conterminous owner, the three latter requirements do not apply. Thus, a conterminous landowner ... must prove open, notorious, hostile, continuous, and exclusive possession for only ten years. He need not prove either a deed or color of title to the property, annual listings for taxation, or descent or devise from a predecessor in order to maintain his claim. Mardis v. Nichols, 393 So.2d 976 (Ala.1981).'
“Tidwell v. Strickler, 457 So.2d 365, 368 (Ala.1984); see also Garringer v. Wingard, 585 So.2d 898, 900 (Ala.1991); and Carpenter v. Huffman, 294 Ala. 189, 191, 314 So.2d 65, 67 (1975) (applying the predecessor statute to § 6-5-200).”
Springfield Missionary Baptist Church v. Wall, 993 So.2d 469, 474-75 (Ala.Civ.App.2008) (footnote omitted).
In the present case, Taylor failed to present clear and convincing evidence indicating that his use of the disputed area was either hostile or exclusive.
“The element of hostility is generally not satisfied where the possessor entered by permission of the true owner. Where the entry was originally permissive, possession is presumed to continue as permissive until there is a repudiation of the permission by the adverse possessor such that it puts the true owner on notice of the adverse claim of the possessor.”
1 Evans, Alabama Property Rights and Remedies § 10.3[d] (footnotes omitted). The evidence was undisputed that Taylor, the Jackses, Adams, and their predecessors in title had long used the area between the intact inside fence and the previously existing outside fence as a “cattle lane” to move their stock from pasture to pasture. Adams testified that her father and Taylor’s father had had an agreement that Taylor could “use the cow lane,” but, she said, the cow lane was “not [Taylor’s] to keep.” Taylor failed to refute Adams’s testimony that Taylor’s use of the area had always been permissive.
“Exclusivity is usually demonstrated by acts consistent with ownership — such acts as would ordinarily be performed by the true owner of the land in appropriating it or its earnings to his own use .... ” 1 Evans, Alabama Property Rights and *510 Remedies § 10.3[f] (footnote omitted). The evidence tended to show that Taylor had cut trees in the disputed area at least once, and perhaps as many as three times. Each time, either Debbie Jacks, Adams, or Bice had instructed him to stop the cutting and he had complied. Taylor failed to assert any right to the property in response to Adams’s statement that the disputed area was “not Mr. Taylor’s land. This is my land. You can go tell Mr. Taylor [that] if he wants to come talk to me I will be at the house.”
We conclude that Taylor did not establish adverse possession of the disputed area.

Alteration of the Boundary Line by Agreement

Although Taylor’s complaint alleged that he and the predecessors in title to the Jackses and Adams had agreed that the inside fence marked the boundary between the coterminous owners, Taylor presented no evidence of such an agreement. He testified that he thought he owned all the property up to the inside fence and that, in his opinion, the inside fence was the boundary line, but he offered no evidence indicating that he or his predecessors in title had agreed with the Jackses or Adams, or their predecessors in title, that the boundary line was anything other than what the parties’ deeds reflected.
Moreover, even if such an agreement had been shown, it would have been without effect because the parties’ deeds and titles were based upon the lines of the government survey and no agreement of the parties could relocate the section line. See Oliver v. Oliver, 187 Ala. 340, 343-44, 65 So. 373, 375 (1914). In Oliver, the supreme court held:
“Plaintiffs theory of the case seems to be that any recognition by former owners of the two tracts of a ‘made line,’ wherever it might be, was binding upon them, although their respective deeds and titles were based on the lines of the government survey, and regardless of the absence of an adverse possession up to such line.
“This is not the law, for recognition by adjoining owners of a false line as the boundary between them is without effect, unless the party claiming beyond the true line also holds hostile possession up to the false line until the bar of the statute is complete. Even a formal agreement between them as to such a line could not, of itself, vest title in one of them beyond the true line to which each actually owns. Certainly it could not have the effect of transferring one part of a government survey 40 to the 40 just below it, although acquiescence in such a line would prima facie indicate its verity.”
Id. See also Guyse v. Chappell, 367 So.2d 944, 946 (Ala.1979) (stating that “[o]ur cases are clear that no agreement or act (e.g., adverse possession) of adjacent landowners can relocate the section lines, or interior subdivision lines established by government survey, for they are certain in legal contemplation”); Mims v. Alabama Power Co., 262 Ala. 121, 77 So.2d 648 (1955); McNeil v. Hadden, 261 Ala. 691, 76 So.2d 160 (1954); Upton v. Read, 256 Ala. 593, 56 So.2d 644 (1952); Wilson v. Cooper, 256 Ala. 184, 54 So.2d 286 (1951); Alford v. Rodgers, 242 Ala. 370, 6 So.2d 409 (1942); and Dial v. Bond, 849 So.2d 189 (Ala.Civ.App.2002).
Taylor claimed ownership of property only in Section 33, as described in his deed, and disclaimed ownership of any property in Section 4. The Jackses and Adams claimed ownership of property only in Section 4, as described in their deeds, and disclaimed ownership of any property in Section 33.
*511 Because Taylor failed to prove either adverse possession or an agreement between the parties to alter the boundary line between their properties, the judgment of the trial court altering the boundary from the United States Government section line to the “old lane fence, described by [the parties] and their witnesses as the inside fence, apparently still remaining this day” is plainly and palpably erroneous.
The judgment of the Chilton Circuit Court is reversed, and the cause is remanded for proceedings consistent with this opinion.
APPLICATION FOR REHEARING GRANTED; OPINION OF NOVEMBER 2, 2007, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN and MOORE, JJ., concur.
BRYAN, J., concurs in the result, without writing.
*512 [[Image here]]

. Although none of the parties mentions that the emphasized portion of the description in the Jackses' deed appears to be erroneous, we note that it is impossible to begin at the northeast comer of Section 14 and to run thence west along the north line of Section 4, much less to begin at the northeast corner, to run west 4,013.5 feet, and then to be at the point of beginning. Thus, we assume that the reference in the deed to Section 14 must be a typographical error and must be interpreted to read as follows:
“Begin at the NE corner of Section 4, Township 21 North, Range 15 East, Chilton County, Alabama, and run thence W along the N line of Section 4 and a fence line a distance of 4,013.5 feet to a point; from said point ...